**JOY TECHNOLOGIES, INC., Plaintiff,**

v.

**Harry F. MANBECK, Jr., Commissioner of Patents and Trademarks, Defendant.**

Civ. A. No. 88–3656–OG.

United States District Court,
District of Columbia.

Nov. 14, 1990.

Raymond G. Hasley, Michael Kushnick, Rose, Schmidt, Hasley & DiSalle (E. Wallace Breisch, of counsel), Pittsburgh, Pa., for plaintiff.

Fred E. McKelvey, Sol., Lee E. Barrett, Associate Sol., United States Patent and Trademark Office, Washington, D.C., for defendant.

OPINION

BENNETT, Senior Circuit Judge.*

This case is before the court following a bench trial held June 25 and 26, 1990. This court has jurisdiction over the parties and the subject matter under 35 U.S.C. § 145 and § 306 (1988). The plaintiff, Joy Technologies, Inc. (Joy), brought this action against the defendant, the Commissioner of Patents and Trademarks (Commissioner),[1] under 35 U.S.C. § 145 (1988) challenging the reexamination decision of the Patent and Trademark Office, which held claims 1 to 4, 11, 12, 16, and 18 of Joy's U.S. Patent No. 4,042,864 (the '864 patent) unpatentable under 35 U.S.C. § 103 (obviousness).

On March 12, 1990, this court denied the Commissioner's motion for summary judgment that the invention set forth in the claims at issue would have been obvious and that the decision of the Patent and Trademark Office Board of Patent Appeals and Interferences (Board) was correct. *Joy Technologies, Inc. v. Quigg,* 732 F.Supp. 227, 14 USPQ2d 1432 (D.D.C.1990). This court held that genuine issues of material fact existed concerning objective indicia of nonobviousness. However, Joy had failed to raise a genuine issue as to the other factual issues concerning the scope and content of the prior art, the level of skill in the art, and the differences between the prior art and the claimed invention. Those facts were therefore deemed established pursuant to Fed.R.Civ.P. 56(d) and were set forth in an order accompanying the decision denying the motion for summary judgment. The trial held June 25 and 26 was limited to issues relating to the objective evidence of nonobviousness.

As explained below and as fully set forth in the appended Findings of Fact Relating to Objective Indicia of Nonobviousness, the court finds that while Joy has shown that its AC–DC shuttle car was commercially successful, Joy has not shown a nexus between the commercial success and the invention recited in the claims. Rather, the success was due to features of the particular electronic circuitry disclosed in the patent and used in Joy's commercial embodiment, but not recited in the broad independent claims and dependent claims at issue. Therefore, Joy's evidence of commercial success does not have substantial weight. The other objective evidence presented by Joy likewise does not have substantial weight, as explained below. The court concludes that, in view of the prior art, the invention of claims 1 to 4, 11, 12, 16, and 18 would have been obvious to a person of ordinary skill in the art at the time the invention was made.

## I. BACKGROUND

The technology at issue in this suit was explained in this court's prior opinion. For convenience of reference, the explanation is repeated here. The '864 patent, which names Melvin Norris as inventor, relates to an AC–DC traction drive control system for a coal mine shuttle car. Shuttle cars are used in coal mines to transfer loose coal from the work area, where the coal is mined, to an unloading area, where convey-

* Marion T. Bennett, Senior Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation. 28 U.S.C. § 291(b) (1988).

1. Joy originally named as defendant then-Commissioner Donald J. Quigg. This court *sua sponte* ordered the substitution of the present Commissioner, Harry F. Manbeck, Jr., pursuant to Rule 25(d), Fed.R.Civ.P.

or belts or cars transfer the material out of the mine.

The coal mine is a hostile environment. Coal seams are often only a few feet thick, and because it is uneconomical to excavate rock surrounding the coal seam, shuttle cars must be designed to operate in a confined space. Moreover, mine operators utilize the "room and pillar" mining method, wherein pillars of coal are left in place for roof support in the mine. Shuttle cars must be designed to negotiate the sharp corners around the pillars.

More importantly, coal mining often releases methane gas, which is explosive. As the mining operations proceed, crosscut tunnels are made and ventilation equipment is put in place to remove the methane gas. However, at the face area (where the coal is mined) adequate ventilation cannot be achieved, and the risk of explosions due to the concentration of methane gas is greatest. Therefore, government regulations require that only "permissible" equipment be used in the face area. Permissible equipment must have electrical circuitry enclosed in an explosion-proof compartment to avoid hazards associated with electrical sparks. Thus, the equipment on a shuttle car must be designed to fit on the car, while at the same time leaving room on the car to haul an adequate amount of coal, and the equipment must be designed to be permissible.

Shuttle cars are essentially electrically powered haulage vehicles. Traction drive motors power the wheels to propel the vehicle. The car has auxiliary equipment, such as hydraulic pump motors and conveyor motors, which are used in loading and unloading the coal. Shuttle cars were first introduced in the late 1930s.

In the prior art, shuttle cars were of two types, the AC type and the DC type. AC shuttle cars are powered by alternating current (AC) supplied by a trailing cable and utilize AC motors for driving the wheels. DC shuttle cars are powered by direct current (DC) supplied by a trailing cable and have DC drive motors.

Each of the types of prior art shuttle cars had its advantages and disadvantages.

For example, AC trailing cables were more expensive, and it was more difficult to locate "faults" in the cable. (A "fault" results when the wire inside the cable breaks.) However, AC is capable of being transmitted more efficiently over distances. DC cables are less expensive and faults are more easily located because interruption of DC causes sparks, which may burn the cable. At the same time, such sparking increases the hazards associated with DC trailing cables. Moreover, power losses associated with the transmission of DC over distances may be significant.

AC motors are considerably more bulky and less efficient than DC motors when used for traction purposes. DC motors are much better suited for traction drive, but AC motors are better for the auxiliary systems on the shuttle car. Finally, in the prior art, other mine equipment at the face area was AC-powered, and if DC shuttle cars were to be used, expensive skid-mounted rectifiers capable of powering whole mine sections had to be bought to convert the AC to DC in order to operate the DC shuttle cars.

Mr. Norris was the first to convert AC to DC on board a shuttle car used commercially. Development of his invention took years of time-consuming effort. In his shuttle car, three phase AC is supplied to the car by means of an AC trailing cable. On board the car, the AC is converted to DC, which is applied to DC traction motors for powering the wheels. The conversion circuitry includes a transformer and a diode bridge rectifier. The incoming AC is applied to the primary windings of the transformer. The AC output from the secondary windings of the transformer is rectified to DC and applied to the traction motors. The shuttle car described in the patent includes a control means which permits the transformer to be selectively activated in different secondary winding configurations to provide different levels of output to the traction motors. The shuttle car may include auxiliary AC motors for operating the hydraulic pump and the conveyor. The auxiliary motors are powered

with a portion of the AC from the trailing cable.

## II. OBJECTIVE INDICIA OF NONOBVIOUSNESS

The trial centered upon Joy's objective evidence of nonobviousness. The court's detailed findings concerning the evidence of "secondary considerations" are fully set forth in the appended findings of fact. Only those findings necessary to the decision are set forth in this opinion.

Objective evidence of nonobviousness must always be considered, when present, as part of the obviousness determination. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39, 218 USPQ 871, 879 (Fed.Cir.1983). Evidence of secondary considerations is not necessarily conclusive on the issue of obviousness. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306, 227 USPQ 657, 674 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986).

A "nexus" is required between the merits of the claimed invention and the objective evidence in order for the evidence to be given substantial weight in the obviousness determination. *See Stratoflex*, 713 F.2d at 1539, 218 USPQ at 879 ("A nexus is required ... if that [objective] evidence is to be given substantial weight...."); *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1555, 220 USPQ 303, 314 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984) ("The objective evidence of nonobviousness ... may in a given case be entitled to more weight or less, depending on its nature and its relationship to the merits of the invention."). *See also Sjolund v. Musland*, 847 F.2d 1573, 1582, 6 USPQ2d 2020, 2028 (Fed.Cir.1988) ("Commercial success is relevant only if it flows from the merits of the *claimed* invention"); *Avia Group International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1564, 7 USPQ2d 1548, 1554 (Fed.Cir.1988) ("Although commercial success is relevant only if a nexus is proven between the success of the patented product and the merits of the claimed invention...."); *In re Felton*, 484 F.2d 495, 501, 179 USPQ 295, 299 (CCPA 1973) ("A nexus between the merits of the invention and the evidence offered must be established before that evidence becomes relevant to the question of obviousness.") A "nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in the determination of nonobviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392, 7 USPQ2d 1222, 1226 (Fed.Cir.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988). The burden of proving a nexus is on the applicant or patent owner. *Id.* at 851 F.2d 1392, 7 USPQ2d at 1226.

An important aspect of the proof of nexus is that the "[o]bjective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support." *In re Tiffin*, 448 F.2d 791, 792, 171 USPQ 294, 294 (CCPA 1971); *In re Lindner*, 457 F.2d 506, 508, 173 USPQ 356, 358 (CCPA 1972); *In re Kerkhoven*, 626 F.2d 846, 850, 205 USPQ 1069, 1072 (CCPA 1980) ("The comparative test data offered by appellant as evidence of the superiority of this claimed method does not rebut the prima facie case of obviousness because it is not commensurate in scope with the claims."). The objective evidence is not commensurate with the claims if the claims are broader than the scope of the objective evidence. *See Tiffin*, 448 F.2d at 792, 171 USPQ at 294 (evidence of commercial success and satisfaction of long-felt need with respect to "cups" not commensurate with the scope of claims broadly reciting "containers"); *In re Grasselli*, 713 F.2d 731, 743, 218 USPQ 769, 778–79 (Fed.Cir.1983) (experiments purporting to show unexpected results using sodium are not commensurate in scope with broad claims to a catalyst with "an alkali metal"). The claims are broader in scope than the objective evidence if a limitation or element recited in the claim is broader than the limitation or element in the objective evidence (*see Tiffin*, 448 F.2d at 792, 171 USPQ at 294 ("cups" in the objective

evidence versus "containers" in the claims)) or if the objective evidence contains limitations or elements not recited in the claims. *See White v. Jeffrey Mining Machinery Co.*, 723 F.2d 1553, 1559, 220 USPQ 703, 706 (Fed.Cir.1983), *cert. denied,* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984) ("That Jeffrey's miner enjoyed commercial success does not support an implication that the jury found that a nexus existed between such success and the claimed invention, because the Jeffrey machine included several features not disclosed or claimed in the White patent."); *In re Fenn,* 639 F.2d 762, 765, 208 USPQ 470, 472 (CCPA 1981) ("the brochure indicates that the diaphragms in the cells allegedly receiving commercial acceptance possessed at least six features not present in the diaphragm prepared by appellant's method....").

A. *Commercial Success*

■ In this case, Joy presented much evidence on the commercial success of its AC–DC shuttle car. The evidence shows that sales of the shuttle car rapidly increased following its introduction in 1970, and since 1976, shipments of AC–DC shuttle cars have generally accounted for over 60% of Joy's total shipments of shuttle cars (which also included AC and DC shuttle cars). Moreover, from 1970 to 1988, Joy's share of the entire shuttle car market has increased from 42% to as much as 86%. Over that time, Joy's market share has been about 60–70% of the entire market. The evidence supports the conclusion that Joy's AC–DC shuttle car has been commercially successful.

Nevertheless, the commercial success was due to certain features of the Joy shuttle car which are not recited in the claims at issue. Thus, the commercial success is not commensurate with the scope of the claims at issue, and the evidence of commercial success does not have substantial weight as to nonobviousness.

At least initially, the Joy AC–DC shuttle cars sold commercially included the circuitry as shown in the '864 patent specification. That circuitry includes a timing circuit and a dynamic braking feature. The timing circuit regulates the energization of the traction motors and permits the start-up of the shuttle car at a slow rate of speed, with the shuttle car accelerating as the energization increases. Timing circuit means is recited in dependent claims 5 and 6, which were determined to be patentable in the reexamination proceeding; timing circuit means is not recited in the claims at issue.

The dynamic braking feature is provided by a control system which permits the traction drive motors to operate as DC generators so that energy stored in the moving car can be dissipated in the resistors of the circuitry. That feature permits the car to slow at a safe speed to apply power in the reverse direction. Dynamic braking means is recited in dependent claims 13 and 17, which were determined to be patentable in the reexamination proceeding. Dynamic braking means is not recited in the claims at issue and is not inherent in an AC–DC drive.

One of the witnesses, E.M. Warner, wrote an article describing the Joy AC–DC shuttle car. *Status Report on Solid State Controls for Underground Mining Machines,* Mining Congress Journal, March 1973. In the article, he described how the timing and dynamic braking circuitry of the Joy AC–DC shuttle car overcomes problems associated with "plugging" shuttle car motors. A shuttle car operator "plugs" the motors when he pushes on the reverse foot pedal while the car is moving in one direction in order to stop the car or to reverse it. This sudden reversal of the electric current to the motors has detrimental effects on the motors and the controls. The timing and dynamic braking circuits prevent high currents when plugging, resulting in smooth stopping and prevention of shock loading on the shuttle car gearing.

One of the first large orders for Joy AC–DC shuttle cars was placed by Peabody Coal Company. The order resulted from a demonstration of the AC–DC shuttle car by Mr. Norris and others. In that demonstration, a bolt was placed on top of the machine, and the shuttle car was run full

speed in one direction and suddenly plugged to reverse it. The machine was run at full speed back and forth without upsetting the bolt. The demonstration showed that the shuttle car could be subjected to plugging without damaging the motors, gearing, or drive shafts. The Peabody Coal personnel considered that to be a positive demonstration because that type of control would greatly lower both the electrical and mechanical maintenance of the car.

The evidence shows that the main reason for the commercial success of the Joy AC–DC shuttle car was the reduced operating costs due to elimination of shock loading and stresses in the traction drive system. That feature was the result of the specific circuitry used in the Joy shuttle car; i.e., the timing and dynamic braking circuitry. Without that circuitry, the car would not have been as commercially successful. However, the timing circuitry and dynamic braking features are not recited in the claims at issue. Therefore, Joy has not established a nexus between the commercial success and the invention recited in the claims at issue. *See Sjolund v. Musland,* 847 F.2d 1573, 1582, 6 USPQ2d 2020, 2028 (Fed.Cir.1988) (jury not entitled to draw the inference that the success of the device was due to the merits of the claimed invention where "all the evidence was to the effect that its commercial popularity was due to ... a feature not claimed.").

Aside from the timing circuitry and dynamic braking features, other evidence shows that Joy has not established a nexus between the commercial success and the invention recited in the claims. In Joy's AC–DC shuttle car, DC power is not switched under load. When DC is interrupted, electrical arcs may result, which could damage electrical components. AC is more easily interrupted because it passes through zero 60 times a second. In the Joy AC–DC shuttle car, AC power is switched off before DC currents are switched. This important feature is not recited in the claims at issue.

In addition, Joy has developed a SCR (*S*ilicon *C*ontrolled *R*ectifier) version of its AC–DC shuttle car. Neither party submitted evidence on whether SCR-based conversion circuitry is structurally equivalent to the diode bridge circuitry described in the '864 patent; therefore, there is no evidence as to whether the SCR control circuitry is covered by the "conversion means" or "rectifier means" limitations in the apparatus claims at issue. The figures Joy has provided for its shipments of AC–DC shuttle cars do not distinguish between the numbers of diode bridge cars and SCR cars. The testimony also showed that Joy continually made other improvements to its commercial AC–DC shuttle cars to make them more reliable and maintainable. The absence of evidence as to the effect of these modifications on the commercial success provides further support for the conclusion that Joy has not shown a nexus between the commercial success and the merits of the claimed invention. *See In re Vamco Machine & Tool, Inc.,* 752 F.2d 1564, 1577 n. 5, 224 USPQ 617, 625 n. 5 (Fed.Cir.1985) ("the commercial success of a machine 'claimed' may be due entirely to improvements or modifications made by others to the invention *disclosed* in a patent. Such success, we are holding, is not pertinent to the non-obviousness of the invention disclosed.").

Joy's evidence of commercial success is not commensurate in scope with its broad claims. Therefore, Joy has not shown a nexus between its evidence of commercial success and the merits of the invention recited in the claims. The evidence that the Joy AC–DC shuttle car was commercially successful does not have substantial weight.

B. *Skepticism*

Expressions by experts of skepticism concerning the invention constitute strong objective evidence of nonobviousness. *Environmental Designs, Ltd. v. Union Oil Co. of Cal.,* 713 F.2d 693, 697–98, 218 USPQ 865, 869 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984); *Burlington Industries, Inc. v. Quigg,* 229 USPQ 916, 918–19 (D.D.C.1986), *aff'd,* 822 F.2d 1581, 3 USPQ2d 1436 (Fed.Cir.1987). In this case,

Joy presented a variety of evidence that people were skeptical of the AC–DC shuttle car when it was introduced. However, the evidence shows that the skepticism about the Joy AC–DC shuttle car was directed to economic and commercial factors, not the technical merit of AC to DC conversion on board a shuttle car. There is no evidence showing skepticism related to any technical reasons why one of ordinary skill in the art could not have made the claimed invention. The evidence of skepticism does not have substantial weight.

C. *Expert Opinion*

Dr. J. Hilary Kelley, former Dean of Mineral and Energy Resources at West Virginia University, first learned of the Joy AC–DC shuttle car in the early or mid–1970s and was so impressed that he traveled to Joy's plant to learn more about it. He did not witness the car in operation. Dr. Kelley considered the AC–DC shuttle car to be a revolutionary development.

Dr. Kelley's testimony that he found the Joy AC–DC car to be revolutionary is not especially persuasive. While he testified that he may have had sufficient academic credits for a bachelor's degree in electrical engineering, there was no showing that he was qualified in the subject matter of control drives. In addition, he acknowledged that prior to his learning about the Joy AC–DC shuttle car, there had been discussions about the desirable features of AC controls and DC traction motors, and he stated that there was naturally a desire to have the advantages of AC control and the advantages of DC traction. However, there was no showing that Dr. Kelley was familiar with the prior art AC–DC drive systems that were used in other mining operations and that may have suggested a solution to the problem he recognized. Thus, the evidence did not show whether Dr. Kelley's opinion that the Joy control system was revolutionary was based on any comparison of the invention recited in the claims with AC–DC conversion systems that were known in the prior art.

D. *Copying*

Copying of a claimed invention may be evidence of nonobviousness. *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 317, 227 USPQ 766, 771 (Fed.Cir.1985). However, "more than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue." *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1028, 226 USPQ 881, 889 (Fed.Cir.1985). Here, there is no evidence to show that the *claimed invention* was copied or, if so, why it was copied. National Mine Service introduced an AC–DC shuttle car in about 1980 but did not duplicate the circuitry of the Joy AC–DC shuttle car. A 1979 advertisement shows that FMC also introduced an AC–DC shuttle car. The advertisement does not show what, if anything, of the claimed invention was copied. The evidence of copying does not have substantial weight.

III. OBVIOUSNESS OF THE INVENTION OF THE CLAIMS AT ISSUE

Under 35 U.S.C. § 103 (1988), a patent on an invention may not be obtained

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Under *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966), four factual inquiries must be made in the obviousness determination: (1) the scope and content of the prior art; (2) the differences between the prior art and the claimed invention; (3) the level of ordinary skill in the art; and (4) "secondary considerations" which serve as objective indicia of nonobviousness.

In the prior proceedings in this case, facts relating to the scope and content of the prior art, the level of ordinary skill in the art, and the differences between the claimed invention and the prior art appeared without substantial controversy and so were deemed established as set forth in

this court's order and memorandum of March 12, 1990 (*see* 732 F.Supp. 227, 14 USPQ2d 1432). In summary, the court first decided that Joy had not shown that there was a genuine issue of material fact as to the scope of the prior art. The court determined that the record showed without genuine dispute that shuttle car technology, aboveground mine shovel technology (the P & H shovel references), and locomotive technology were all within the scope of the relevant prior art. The court also determined that the teachings of the references are evident from the references themselves and Joy had not raised any genuine issue of material fact concerning the content of the prior art. Finally, the court held that there was no genuine issue of material fact concerning the level of skill in the art and the differences between the prior art and the claimed invention. Familiarity with the prior order and memorandum is presumed, and they are incorporated herein by reference.

The invention of the claims at issue would have been obvious to a person of ordinary skill in the art in view of the prior art cited. As discussed above, prior art shuttle cars were either AC-type or DC-type. The relative advantages and disadvantages of each type of power system were known in the art. U.S. Patent No. 3,257,597 to Weiser recognized that AC motors were considerably more bulky and less efficient than DC motors when used for traction purposes and that attempts had been made to convert AC input to DC output in the electric locomotive field in order to combine the advantages of AC power distribution and DC propulsion systems. The Alexanderson patent, U.S. Patent No. 2,549,405, recognized that DC drive motors are advantageous in trolley locomotives because of their easily obtainable variable speeds, but for long-distance operations, AC is advantageous because of the ease with which voltages may be increased for power transmission and decreased for utilization. The Barnes article [2], *Mining with a-c power*, Mechanization, October 1960, sets forth many reasons for the trend toward AC mining from DC mining, including the increased efficiency of power transmission. Finally, at trial Dr. Kelley testified that it was common knowledge that DC had advantages and disadvantages, and he believed that the disadvantages of DC are solved by features of AC equipment. He stated that there was naturally a desire to have the advantages of AC control and the advantages of DC traction.

Based on the known relative advantages and disadvantages of AC and DC systems, one skilled in the art would have desired to combine an AC control system and a DC traction drive on a shuttle car in order to have the advantages of both. The P & H shovel references and the locomotive references would have made it obvious to one of ordinary skill in the art how that combination of AC power and DC traction could be made.

The P & H shovel references relate to an aboveground surface mine loader. The shovel has a DC traction motor and a three phase AC power supply rectified in controllable amounts for application to the DC motor. The power conversion system of the shovel includes a transformer with a three phase AC output. Silicon controlled rectifiers ("thyristors") rectify the AC output to DC. The references show that a portion of the AC power supply is diverted for application to AC auxiliary equipment.

French Brevet d'Invention No. 1,152,782 (the French patent) relates to a locomotive which has an AC–DC conversion system. Single phase AC power is converted in controllable amounts for application to a DC motor. The conversion system includes a

2. At trial, Joy objected to the admission of the Barnes article on the basis of hearsay. The court received the article in evidence, but stated that the weight to be accorded the article would be decided later.

The Barnes article is admissible. A prior art document submitted as a "printed publication" under 35 U.S.C. § 102(a) is offered simply as evidence of what it describes, not for proving the truth of the matters addressed in the document. Therefore, it is not hearsay under Fed. R.Evid. 801(c).

The weight to be accorded the Barnes article in this case is the same as the weight to be accorded any of the other prior art documents.

transformer and rectifiers. The output of the conversion system is controlled by selecting different configurations of transformer windings.

U.S. Patent No. 2,434,585 to Renshaw shows an electric locomotive energized by either a trolley conductor or a cable reel. The Sessions patent (U.S. Patent No. 1,123,602) shows a coal mine locomotive with a cable reel. U.S. Patent No. 2,599,-061 to Lee shows a prior art shuttle car, which is powered through use of a cable reel. Finally, the Muskingum Electric Railroad article in IEEE Conference Record of 1968 Third Annual Meeting of the IEEE Industry and General Applications Group, Sept.–Oct. 1968, shows an AC–DC conversion system for use on an aboveground electric railroad. The article shows that the output from the conversion system transformer can be controlled in a step-by-step fashion using switches which select different secondary windings of the transformer.

Independent claim 1 recites a mobile coal haulage machine, such as a shuttle car, having a DC traction motor, conversion means for converting three phase AC to DC output, control means for controllably applying the DC output to the traction motor, and a trailing cable for supplying three phase AC.

It would have been obvious to one of ordinary skill in the art to modify the prior art shuttle cars in order to utilize the known advantages of AC control and DC traction by using an AC–DC conversion system as suggested by the P & H shovel references or the locomotive references. Those references show an AC–DC conversion system for rectifying three phase AC power to DC for application to DC traction motors. In the French patent and the Muskingum electric railroad article, the output of the conversion system is controlled by selecting different winding configurations of the transformer. The references show that AC may be supplied through a trailing cable. The apparatus of claim 1 would have been obvious in view of the prior art.

Independent claim 16 is directed to a control drive system for a steerable wheeled vehicle such as a shuttle car. The control drive system includes a conversion means for converting AC input to DC output for application to DC traction motors. The conversion means has a transformer having a plurality of different configurations of secondary windings. The control means operates by selecting one of the secondary winding configurations so that the degree of energization of the DC traction motors can be controlled.

The basic elements of the AC–DC conversion system have been discussed above respecting claim 1. The French patent and the Muskingum railroad article each show that the output from the conversion system can be controlled by selecting different configurations of transformer windings. The control drive system of claim 16 would have been obvious in view of the prior art.

Claim 18 is directed to a method of operating a mobile machine in an underground passageway of a mine. The method includes the steps of reeling and unreeling a trailing cable, converting three phase AC input to DC output, and energizing the traction motors by the DC output.

The method of claim 18 is inherent in the use of the apparatus recited in claims 1 and 16. The specific limitations of claim 18 would have been obvious in view of the prior art as discussed above respecting claims 1 and 16.

Joy did not separately argue the patentability of the dependent claims at issue. Therefore, those claims stand or fall with the independent claims. *In re Nielson,* 816 F.2d 1567, 1572, 2 USPQ2d 1525, 1528 (Fed.Cir.1987).

Joy's principal argument for the patentability of the claims relates to the main difference between the prior art mine shovel and locomotive references and the Joy shuttle car; namely, the necessity of shuttle cars being permissible equipment in order to operate at the face area of the coal mine. Joy asserts that the inventor was faced with the problem of designing a drive that could be placed within the permissible enclosures of existing shuttle cars. According to Joy, the prior art P & H shovel

and electric locomotives were too large and were not permissible equipment. Joy states that one skilled in the art could not use them in designing a shuttle car because incorporating the features of the shovel or locomotive on a shuttle car would result in an illegal machine. Therefore, asserts Joy, the references provide no guidance in designing an AC–DC shuttle car.

Joy's arguments are unavailing for two reasons. First, as explained in the court's prior decision, the independent claims do not recite the elements that allegedly make the shuttle car operable in the underground mining environment. Instead, the claims are broadly written to cover AC–DC conversion systems on machines such as shuttle cars. *See In re Yamamoto,* 740 F.2d 1569, 1571, 222 USPQ 934, 936 (Fed.Cir.1984) (claims are to be given their broadest reasonable construction, consistent with the specification, during reexamination). Limitations cannot be read into the claims to overcome validity challenges. *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433–34, 7 USPQ2d 1129, 1131–32 (Fed.Cir.), *cert. denied,* 488 U.S. 986, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988); *In re Self,* 671 F.2d 1344, 1348, 213 USPQ 1, 5 (CCPA 1982). Joy's arguments concerning the permissibility of its shuttle car are not based on any limitations appearing in the claims and so are not relevant to the patentability issue. *See In re Thomson,* 336 F.2d 604, 607, 143 USPQ 21, 23 (CCPA 1964), *cert. denied,* 380 U.S. 972, 85 S.Ct. 1330, 14 L.Ed.2d 268 (1965) ("Appellant's contention that the problems of miniaturization were not encountered or taught by the prior art is not relevant to the issue before us, since miniaturized resistors are not being claimed. A particular feature upon which an applicant predicates patentability must be recited in the claims; it is not sufficient merely to disclose it in the specification.").

In addition, while the prior art AC–DC conversion systems may not be permissive or may be too large to be used on a shuttle car, the test is what the prior art would have suggested to the person of ordinary skill in the art, not whether the features of the references may be bodily incorporated into a shuttle car. *See In re Keller,* 642 F.2d 413, 425, 208 USPQ 871, 881 (CCPA 1981); *In re Sneed,* 710 F.2d 1544, 1550, 218 USPQ 385, 389 (Fed.Cir. 1983).

As discussed above, Joy's evidence of commercial success, skepticism, and copying does not have substantial weight. Dr. Kelley's testimony that he considered the AC–DC shuttle car to be "revolutionary" did not show whether his opinion was based on any knowledge of the prior art which showed AC–DC conversion systems on other mining equipment. His opinion is not especially persuasive. Claims 1, 16, and 18 would have been obvious to a person of ordinary skill in the art at the time the invention was made. The Board correctly determined that claims 1 to 4, 11, 12, 16, and 18 were unpatentable under 35 U.S.C. § 103.

## IV. EXPENSES OF THE PROCEEDING

Under the reexamination statute, 35 U.S.C. § 306, a patent owner may seek judicial review of the PTO's reexamination decision by way of either direct appeal to the United States Court of Appeals for the Federal Circuit under 35 U.S.C. §§ 141–144 or by way of a civil action in this court under 35 U.S.C. § 145. Joy chose the latter.

Section 145 provides that "[a]ll the expenses of the proceedings shall be paid by the applicant." Joy asserts that it is not an "applicant" within the intent of section 145, but was involuntarily forced into these proceedings by a third party's request for reexamination. Joy argues that under 35 U.S.C. § 302 the party seeking reexamination is required to pay such fees for reexamination as determined by the Commissioner. According to Joy, the third party requester should be responsible for the Commissioner's expenses under the reexamination statute.

Joy correctly points out that "applicant" does not precisely define its status in this case. However, viewing section 145

as a whole, it is clear that "applicant" in that statute applies both to a patent applicant dissatisfied with the decision of the PTO on his initial application and to a patent owner dissatisfied with the PTO's decision in a reexamination proceeding. Section 306 makes the court review provisions of section 145 applicable in reexamination proceedings; however, section 145 uses only the term "applicant" in referring to the party bringing the action. If section 145 is to cover civil actions arising from reexamination proceedings, the term "applicant" in that section must be construed to cover patent owners bringing those actions. Construing the term consistently throughout the section compels the conclusion that patent owners, as well as patent applicants, must pay the Commissioner's expenses.

Joy's arguments that it was involuntarily brought into these proceedings and that the reexamination requester should be responsible for the Commissioner's expenses in the section 145 action are unpersuasive. While the reexamination proceeding in the Patent and Trademark Office may have been commenced against Joy's wishes, Joy chose to bring the section 145 action. If it wished to avoid payment of the Commissioner's expenses under section 145, it could have proceeded by way of a direct appeal to the Federal Circuit under sections 141–144. In addition, while Congress has authorized the Commissioner to establish a reexamination fee to be paid by the reexamination requester, the expenses for which Joy is liable under section 145 are the expenses of this civil action, not the reexamination proceeding before the PTO.

Joy is liable for the expenses of the Commissioner in this proceeding.

## V. CONCLUSION

1. The Board correctly affirmed the rejection of claims 1 to 4, 11, 12, 16, and 18 of U.S. Patent No. 4,042,864 as unpatentable under 35 U.S.C. § 103.

2. Joy shall pay the reasonable expenses of the Commissioner incurred in this proceeding.

3. A separate judgment accompanies this opinion.

## ADDENDUM

## FINDINGS OF FACT RELATING TO OBJECTIVE INDICIA OF NONOBVIOUSNESS

### A. *Commercial Success*

1. Prior to Norris' invention, National Mine Service (National) was the principal competitor of Joy in the manufacture and sale of shuttle cars for use in underground mines.

2. Both Joy and National offered coal mine operators a choice of AC or DC drive shuttle cars.

3. At the time of the Norris invention in 1970, Joy had less than half of the shuttle car market.

4. After Joy introduced the AC–DC shuttle car in 1970, it continued to make and sell its prior AC and DC shuttle cars.

5. By personal demonstrations of the Joy AC–DC shuttle cars, Norris convinced personnel of Peabody Coal Company and Consolidated Coal Company to try the machines, and they did so following the demonstrations.

6. Both Peabody and Consolidated ordered a number of the AC–DC cars in preference to the same car with either an AC or a DC system.

7. By the mid–1970s, the mining industry was getting convinced that the Joy AC–DC drive system was a much better drive than the DC or AC drive.

8. When the AC–DC shuttle car was first introduced, there was no significant price differential between the AC–DC, AC, and DC shuttle cars. Subsequently, the Joy AC–DC shuttle cars were sold at a higher price than either AC or DC cars. Since 1980, Joy's AC–DC shuttle cars have been more expensive than comparable DC shuttle cars, but less expensive than AC shuttle cars.

9. In the first two years (1970 and 1971) following introduction of the AC–DC shuttle car, Joy's shipments of its AC–DC shut-

tle car accounted respectively for only 2% and 4% of its total shipments of shuttle cars. Shipments of AC–DC shuttle cars increased to 47% by 1975, and increased to over 60% by 1976. Since that time, shipments of AC–DC shuttle cars have generally accounted for over 60% of Joy's total shipments.

10. At the time of the introduction of the Joy AC–DC shuttle car, Joy was one of the two largest manufacturers of shuttle cars. From 1970 to 1988, Joy's market share of the entire shuttle car market increased from 42% to as much as 86% in 1980. Over that time, Joy's market share has generally been about 60–70% of the entire market.

11. In competition with Joy's own AC and DC shuttle cars and with the products of National Mine Service, Joy's AC–DC shuttle car has met with commercial success.

12. Nevertheless, the commercial success was due to certain features of the Joy shuttle car not recited in the claims at issue. To the extent the Joy AC–DC shuttle car was commercially successful, it was an overall system design that proved its superiority.

13. At least initially, the Joy AC–DC shuttle cars that were sold commercially included the circuitry as shown in the '864 patent. The circuitry includes a control system which permits the traction drive motors to operate as DC generators so that energy stored in the moving car can be dissipated in the resistors of the circuitry. That "dynamic braking" circuitry permits the car to slow at a safe speed to apply power in the reverse direction. Dynamic braking means is recited in dependent claims 13 and 17, which were determined to be patentable in the reexamination proceeding. Dynamic braking means is not recited in the claims at issue. Dynamic braking is not inherent in an AC–DC drive.

14. The circuitry of the Joy shuttle car also includes a timing circuit for regulating the energization of the traction motors. The timing circuit permits the start-up of the shuttle car at a slow rate of speed with the shuttle car accelerating as the energization increases. Timing circuit means is recited in dependent claims 5 and 6, which were determined to be patentable in the reexamination proceeding. Timing circuit means is not recited in the claims at issue.

15. An article in evidence by Warner, *Status Report on Solid State Controls for Underground Mining Machines,* Mining Congress Journal, March 1973, describes the Joy AC–DC shuttle car drive system. According to the article, the timing and dynamic braking circuitry of the Joy AC–DC shuttle car overcomes problems associated with "plugging" shuttle car motors. A shuttle car operator "plugs" the motors when he pushes on the reverse foot pedal while the car is moving in order to stop the car or to reverse it. This sudden reversal of the current has detrimental effects on the motors and the controls. The timing and dynamic braking circuitry prevents high currents when plugging, resulting in smooth stopping and preventing shock loading on the shuttle car gearing.

16. The demonstration that convinced Peabody Coal to place orders for the Joy AC–DC shuttle cars (see Finding 5) featured the timing circuitry and dynamic braking aspects of the Joy shuttle car. In that demonstration, a bolt was placed on top of the machine, and the shuttle car was run full speed in one direction and suddenly "plugged" to reverse it. The machine was run full speed back and forth without upsetting the bolt. The demonstration showed that the shuttle car could be subjected to "plugging" without damaging the motors or gears or drive shafts. The Peabody Coal people considered this to be a positive demonstration because that type of control would greatly lower both the electrical and mechanical maintenance on the car. The demonstration led to the order from Peabody.

17. The main reason for the commercial success of the Joy AC–DC shuttle car was the reduced operating costs due to elimination of shock loading and stresses in the traction drive system. That feature was the result of the specific circuitry used in the Joy shuttle car; i.e., the timing and dynamic braking circuitry. Without that

circuitry, the shuttle car would not have been as commercially successful. However, the claims at issue do not recite the timing and dynamic braking circuitry. Therefore, the evidence shows that what was commercially successful was not the invention recited in the claims at issue.

18. Aside from the timing circuitry and dynamic braking features, other evidence shows that the commercial success may have been due to other features not recited in the claims at issue. A further advantage of the Joy AC–DC drive, not recited in the claims at issue, is that DC power is not switched under load. When DC is interrupted, electrical arcs may result, which could damage electrical components. Because AC passes through zero 60 times a second, it is more easily interrupted without arcing. An important feature of the Joy AC–DC shuttle car was switching off the AC power before switching DC currents, rather than switching DC under load. Switching AC rather than DC under load permitted Norris to avoid using large DC contactors. This feature is not recited in the claims of the '864 patent, and the evidence does not show the effect of this feature on the commercial success of the Joy AC–DC shuttle car.

19. Joy has also developed an AC–DC SCR (*S*ilicon *C*ontrolled *R*ectifier) version of its AC–DC shuttle car. Neither party submitted any evidence on whether SCR-based AC–DC conversion circuitry is structurally equivalent to the diode bridge circuitry described in the '864 patent specification; therefore, there is no evidence to show whether the SCR control circuitry is covered by the "conversion means" or "rectifier means" limitations in the apparatus claims at issue. In addition, the sales figures Joy has submitted do not separate the numbers of diode bridge and SCR AC–DC shuttle cars. Therefore, the evidence does not show the effect of the SCR option on the commercial success of the Joy AC–DC shuttle car.

20. Joy continually made improvements to the commercial AC–DC shuttle cars to make them more reliable and maintainable. One improvement was to gradually adapt the original shuttle car components to solid-state components. Also, Joy modified the original transformer winding configurations so that it used only a delta and a star connection in the secondary windings of the transformer. Thus, later production versions of the AC–DC shuttle car did not have the secondary transformer windings with the extended star configuration recited in claims 7 and 8 at issue. Such modifications are further evidence that the Joy shuttle car that became commercially successful was not commensurate with the scope of the claims at issue.

21. In summary, while Joy has shown that its AC–DC shuttle car was commercially successful, the evidence does not show a nexus between the commercial success and the invention recited in the claims at issue. The testimony indicates that the principal reason for the commercial success of the Joy AC–DC shuttle car was the timing circuitry and the dynamic braking feature. Those features are not recited in the claims at issue. Moreover, as initially sold, the Joy shuttle car included the circuitry disclosed in the '864 specification; however, the circuitry in the shuttle car has been modified in several ways. The evidence does not show the effect of those modifications on the commercial success of the shuttle car. The evidence that Joy presented relates to the commercial success of the specific machine it sold, which included several features and modifications not present in the claimed invention. The evidence was therefore not commensurate in scope with the claims. Joy's evidence of commercial success is not entitled to substantial weight in the obviousness determination.

B. *Skepticism*

22. Joy's sales manager, Carl Schrock, had little or no confidence in an AC–DC drive for shuttle cars and believed that it would not be a successful product. Mr. Schrock's opinion was that Joy would have a difficult time selling the shuttle cars due to the difficulty of locating faults in the AC trailing cable and splicing them once found.

23. John Boyd, a leading professional mining consultant, thought an AC–DC drive unnecessary. In his opinion, either AC drive or DC drive was satisfactory. Mr. Boyd's skepticism was due to the perceived disadvantages of AC trailing cables and the shuttle car's electrical control system, which in his opinion would create substantial maintenance problems in keeping the shuttle car in operation.

24. Joy's competitor, National Mine Service, a leading manufacturer of shuttle cars at the time, prepared a comparison between its shuttle car and the Joy AC–DC shuttle car which criticized the AC–DC drive and showed that it believed that its conventional DC drive had superior qualities and advantages. The comparison was prepared as a sales tool by NMS to educate salesmen. The comparison answers a number of claims of superiority Joy had made, including claims relating to a smaller size trailing cable, higher electrical efficiency, better performance, lower maintenance and increased safety. The comparison also discusses the traction speed compensator and dynamic braking features of the Joy shuttle car. The comparison concludes that the advantages claimed for the Joy AC–DC shuttle car have been mostly present on the NMS shuttle car for many years, "without any need for an on-board rectifier and all the associated complexity and difficulty of maintenance that the AC–DC car has to put up with."

25. A district manager, Ed Dansereau, secured an order for the first two cars sold with Norris' invention from a customer who was willing to take a chance on the AC–DC shuttle cars because of Dansereau's reputation. Although the cars worked pretty well, the idea was still resisted.

26. Warner has stated that mining people who heard about the AC–DC shuttle car ridiculed the idea because they thought Joy had combined the worst reliable traction motor and the highest maintenance reeled cable. According to Warner, mining people thought it should be DC–AC, a DC reeled cable and AC traction motors. Warner's statement is directed to economic and commercial factors of reliability and maintenance.

27. The evidence shows that whatever skepticism that the Joy AC–DC shuttle car may have met was directed solely to economic factors such as maintenance and reliability. There is no evidence that the skepticism related to any technical reasons why one skilled in the art could not have made the claimed invention. The evidence of skepticism is not entitled to substantial weight.

C. *Expert Opinion*

28. Dr. J. Hilary Kelley, former Dean of Mineral and Energy Resources at West Virginia University, first learned of the Joy AC–DC shuttle car in the early or mid–1970s and was so impressed that he traveled to Joy's plant to learn more about it. Dr. Kelley considered the AC–DC shuttle car to be a revolutionary development. He planned to introduce information about the AC–DC shuttle car in classes for engineering students.

29. Dr. Kelley based his decision to visit Joy's plant on an advertisement in a mining journal. When he visited the plant, he did not witness an AC–DC shuttle car in operation.

30. Dr. Kelley stated that it was common knowledge that DC had advantages and disadvantages. DC traction is advantageous because it has the best characteristics for starting torque, and he believed that the disadvantages of DC are solved by features of AC equipment. According to Dr. Kelley, the idea of incorporating AC and DC into a single piece of equipment had its obvious advantages. He stated that there was naturally a desire to have the advantages of AC control and the advantages of DC traction, so when the Joy AC–DC shuttle car was introduced, it was something of interest.

31. Dr. Kelley is a mining engineer with knowledge of mine electrical systems. He is named inventor on six to eight patents relating to underground mining. None of the patents deal with the electrical design of control drives for shuttle cars. Dr. Kelley has years of practical experience in

underground mining. While he testified that he may have had sufficient academic credits for a bachelor's degree in electrical engineering, there was no showing that he was qualified in the area of control drives.

### D. *Copying*

32. In about 1980, National Mine Service abandoned its original criticism of the Norris AC–DC drive and introduced an AC–DC shuttle car. NMS did not duplicate the circuitry of the original Joy AC–DC shuttle car.

33. An advertisement in the June 1979 *Coal Mining and Processing* magazine shows that FMC, another shuttle car supplier, introduced an AC–DC shuttle car in or before 1979. The advertisement does not show what, if anything, of the claimed invention was copied by FMC.

34. The evidence of copying does not have substantial weight. Nothing in evidence shows whether the claimed invention was copied or the reasons for the alleged copying.

### JUDGMENT

In consideration of the Opinion issued this date, judgment is hereby entered in favor of defendant, Harry F. Manbeck, Jr., Commissioner of Patents and Trademarks, and against plaintiff, Joy Technologies, Inc.