The B.F. GOODRICH COMPANY, Plaintiff–Appellant,

v.

AIRCRAFT BRAKING SYSTEMS CORPORATION, and Allied–Signal Incorporated, Defendants/Cross–Appellants.

Nos. 95–1112, 95–1120, and 95–1143.

United States Court of Appeals, Federal Circuit.

Jan. 4, 1996.

Harry J. Roper, Roper & Quigg, Chicago, Illinois, argued, for plaintiff-appellant. Of counsel were William P. Oberhardt, Raymond N. Nimrod, Ellen D. Law, and Sarah L. Taylor, Roper & Quigg, Chicago, Illinois.

Ray L. Weber, Renner, Kenner, Greive, Bobak, Taylor & Weber, Akron, Ohio, argued

for defendant/cross-appellant Aircraft Braking Systems Corporation.

Kenneth W. Starr, Kirkland & Ellis, Washington, DC, argued, for defendant/cross-appellant Allied–Signal Inc. Of counsel were Donald G. Kempf, Jr., P.C., David M. Elston, and Jonathan F. Putnam, Kirkland & Ellis, Chicago, Illinois.

Before ARCHER, Chief Judge,
NEWMAN, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

The B.F. Goodrich Co. (BFG) appeals from the judgment of the United States District Court for the District of Delaware holding (1) U.S. Patents 4,742,895 and 4,613,017 invalid under 35 U.S.C. §§ 103 and 102(b) and (2) that Aircraft Braking Systems Corp. (ABS) did not infringe either patent. ABS and Allied–Signal Inc. cross-appeal from the district court's judgment that BFG did not engage in inequitable conduct, requesting that the court hold this to be an exceptional case and award them attorney fees under 35 U.S.C. § 285. *B.F. Goodrich Co. v. Aircraft Braking Sys.*, C.A. Nos. 91–48/91–515–SLR (D.Del. Nov. 10, 1994). Because we conclude that the patents are invalid under 35 U.S.C. § 103 and that BFG did not engage in inequitable conduct, we affirm.

## BACKGROUND

BFG is the assignee of the '017 and '895 patents. The '017 patent is directed to a method of overhauling a disk brake assembly. The '895 patent is a division of the '017 patent and contains apparatus claims for a disk brake assembly. Both patents are entitled to the benefit of the '017 patent's July 2, 1984 filing date and thus July 2, 1983 is the critical date for purposes of 35 U.S.C. § 102.

The claimed brake assembly is used in aircraft landing gear wheels. Figure 4 of the patents is a cross-sectional view illustrating the assembly:

The assembly includes stators 46 positioned between rotors 50. The stators 46 and rotors 50 consist of carbon disks and are sandwiched between end plates 48. The rotors 50 are mechanically attached to a rim (not shown) on which is mounted a tire so that, when the wheel rotates, rotors 50 rotate between stators 46. When the brake is activated, piston 26' applies pressure to one of the two end plates 48, which in turn forces together the rotors and stators against end plate 44 so that the resulting friction between the rotors and stators stops the wheel. Eventually, the carbon disks become worn through friction and must be replaced since a minimum thickness of the disks is required to absorb the heat generated by the friction and ensure effective braking operation.

The invention provides a brake assembly having alternating thick and thin disks, referred to as a thick/thin assembly, consisting of, for example, thin stators and thick rotors. The disks tend to wear evenly. Accordingly, when the thin disks become worn to the point of requiring replacement, the thick disks are only half worn. Only the original thin disks are replaced, and they are replaced with thick disks. The process can be repeated, and, during each maintenance interval, only half of the disks are thus replaced.

In comparison, prior art brake assemblies had disks of uniform thickness. During

prosecution, the patentee distinguished its invention over this feature of the prior art brake assemblies. In response to a final rejection of the '017 patent of the ground of obviousness, the applicant submitted an affidavit by Wesley S. Perry, Director of Engineering for BFG. The following are relevant portions of the Perry affidavit.

That ... he has not seen or heard of the brake construction and method shown and described in the [BFG patent application];

That as Director of Engineering he had the responsibility for reading the literature and trade journals on aircraft brakes and has attended numerous seminars and trade shows on aircraft brakes;

That at no time in the literature or at seminars and trade shows he has attended, has the brake construction and method shown and described in the [BFG patent application] been suggested;

. . . . .

That the common practice in overhauling carbon brakes is to replace all the brake disks after they are substantially completely worn with full thickness disks and that it would not be obvious to replace one set of stators or rotors with a new or refurbished set of full thickness disks while the other set is half worn at overhaul intervals shorter than the refurbished interval for the disks as taught and shown in the [BFG patent application];

. . . . .

That based on his observation and knowledge of the ordinary skilled worker overhauling carbon brakes, the ordinary skilled worker would not have found it expedient through routine experimentation to arrange the rotors and stators of a carbon disk brake with different available wear portions so that after a predetermined number of brake applications said available wear portions of a first group of disks are substantially worn away at an intermediate overhaul time and said available wear portions of a second group of disks are not worn away. . . .

In response to the submission of this affidavit, the U.S. Patent and Trademark Office (PTO) allowed the application, which issued

as the '017 patent. The PTO subsequently allowed the divisional application, which issued as the '895 patent. Claim 1 of the '017 patent and claim 2 of the '895 patent, which are the only independent claims at issue, read as follows:

1. A method of assembling and overhauling a disk brake having a plurality of disks with available wear portions of predetermined different thicknesses comprising positioning a first group of said disks in overlapping relationship with a second group of said disks, said first group of said disks having each of said available wear portions of a first thickness, said second group of said disks having each of said available wear portions of a second thickness, said first thickness of each of said available wear portions of said first group of said disks being less than said second thickness of each of said available wear portions of said second group of said disks, replacing said first group of said disks with a third group of said disks at an intermediate brake overhaul time when said available wear portions of said first group are substantially fully worn, said available wear portions of each of said third group of said disks having a third thickness greater than the thickness of each of said available wear portions of said second group of said disks at said intermediate brake overhaul time.

2. A disk brake assembly comprising a first group of brake disks and a second group of brake disks in axially aligned and interleaved relationship, said disks of said first group being interleaved with said disks of said second group in alternating relationship, each of said disks of said first group and said second group having oppositely disposed wear surfaces, said wear surfaces on opposite sides of each brake disk of said first group are equal in thickness, said wear surfaces on opposite sides of each brake disk of said second group are equal in thickness, said wear surfaces of said first group of said disks having a first thickness, said wear surfaces of said second group of said disks having a second thickness, said first thickness of said first group of said disks being less than said

second thickness of said second group of said disks whereby after a predetermined number of brake applications the available wear thickness of said first group of said disks are substantially fully worn away at an intermediate overhaul time and said available wear thickness of said second group of said disks are not worn away.

During prosecution of the patents, the PTO was apparently not aware of, and hence did not consider, a published paper by employees of Dunlop Ltd. This paper, entitled *The Economic and Safety Aspects of Commercial Aircraft Carbon Brakes* [hereinafter Dunlop], was presented at the International Federation of Airworthiness Annual Conference in Long Beach, California, in April 1982. Although several individuals at BFG had copies of Dunlop in their files, BFG did not cite it to the PTO during prosecution of the patent applications. Relevant portions of Dunlop describe what is referred to as a 2 for 1 refurbishment scheme in which two worn disks are machined to smoothness and then clipped together to form one "new" disk. Dunlop describes how these thicker 2 for 1 disks can be used with new disks:

> Following brake chassis inspection the heat stack can either be put back into the brake for the remainder of its life, or some of the half worn discs can be assembled with re-furbished discs from other brakes. Because of this arrangement it is possible to use reclaimed discs which are thicker than new discs. In other words, during the machining for reclaim [sic] the minimum amount of carbon has been machined off in order not to waste any of this expensive material. Individually these extra thick discs have a life potential well in excess of 3,000 landings. By the use of this half life inspection routine, and by using extra thick discs mixed with part worn discs the cost per brake landing can be reduced significantly.

*Id.* at 11. Dunlop also teaches obtaining maximum use of the carbon disks by building up the heat stack to fill the space available for the disks by using a combination of new and refurbished disks. *Id.* at 12.

In addition, Dunlop describes brake overhaul schedules using the 2 for 1 refurbish-

ment technique. A chart in Dunlop illustrates the overhaul schedules. Aircraft are listed on the left side of the chart, and the months from October 1984 through June 1988 are listed across the top of the chart. The chart contains boxes representing a particular overhaul for the corresponding aircraft and month. The chart also contains a description of several overhaul routines, the most relevant of which are referred to as overhaul combinations 3 and 5. The description for combination 3 states: "New stators, pressure and thrust stators, half worn rotors." That for combination 5 states: "New rotors, half worn stators, pressure and thrust stators." Combinations 3 and 5, therefore, together describe an overhaul scheme involving a thick/thin aircraft brake assembly.

BFG also failed to submit to the PTO other prior art that it was aware of during its prosecution of the patents. This prior art included a Concorde manual, which describes a brake overhaul method used on the Concorde, which was the first commercial aircraft to use carbon disk brakes. According to this method, new or partially worn disks were placed in the brake assembly during overhaul. Thus, after use in this manner, the carbon disks in the Concorde brake had varying thicknesses.

Other prior art also included U.S. Patent 3,480,115, which describes a brake assembly having steel disks arranged in descending order of thickness. BFG had itself used brake assemblies with steel rotors of different wear thicknesses.

BFG also failed to notify the PTO of certain of its own activities which may have implicated the on-sale bar under 35 U.S.C. § 102(b). BFG made a presentation in France to Airbus Industries, which has customers in the United States, concerning the brake assembly in January 1983. Later, BFG met with representatives of Boeing on March 24, 1983 in Seattle, Washington, in order to discuss BFG's carbon brakes. This meeting was part of an ongoing effort by BFG to interest Boeing in its thick/thin carbon aircraft brake assemblies. Even though these activities occurred before the critical date, BFG failed to disclose them to the PTO during prosecution of the '017 and '895 pat-

ents. Moreover, the inventor, Lowell D. Bok, stated in his invention record, which he submitted to a BFG in-house attorney, that the BFG thick/thin brake assemblies had been "proposed for the 757–200, A310–300 and 767–300 Aircraft[.]"

BFG sued ABS and Allied–Signal separately for infringement of claims 2 and 3 of the '895 patent and claims 1–4 of the '017 patent. Both defendants counterclaimed for a declaratory judgment of invalidity and unenforceability, and the cases were consolidated for discovery and a bench trial. In its memorandum opinion following the trial, the district court held that: (1) claims 2 and 3 of the '895 patent and claims 1–4 of the '017 patent were invalid under 35 U.S.C. § 103 as having been obvious over Dunlop and under 35 U.S.C. § 102(b) as having been on sale by virtue of BFG's activities before the critical date; (2) Allied–Signal infringed claims 2 and 3 of the '895 patent and claims 1–4 of the '017 patent; (3) ABS did not infringe any of the asserted claims; and (4) BFG did not engage in inequitable conduct during prosecution of the patents. On appeal, BFG challenges the district court's decision on validity and on infringement by ABS. On cross-appeal, ABS and Allied–Signal challenge the district court's holding that BFG did not engage in inequitable conduct.

## DISCUSSION

### A. *Obviousness*

■ We review the district court's conclusion of obviousness *de novo* as a matter of law. *See Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1393, 222 USPQ 943, 946 (Fed.Cir.1984). A determination of obviousness is based on factual inquiries, *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), which we review under the clearly erroneous standard. Fed. R.Civ.P. 52(a); *Webb*, 742 F.2d at 1393, 222 USPQ at 946; *see also Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050, 5 USPQ2d 1434, 1438 (Fed.Cir.) ("The factual findings of the district court underlying the obviousness determination will be overturned on appeal only if they are clearly errone-

ous."), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988).

BFG argues that the district court erred in holding the inventions of the '895 and '017 patents to have been obvious over Dunlop. BFG contends that there was no suggestion or motivation to modify the teachings of Dunlop to obtain the claimed invention. In addition, BFG alleges that the district court misconstrued or failed to credit evidence of secondary considerations such as commercial success, copying by others, satisfying a long-felt need, and providing significant unexpected advantages.

ABS and Allied–Signal counter that the district court did not err in finding the invention to have been obvious over Dunlop. They contend that Dunlop suggested the claimed invention to one skilled in the art. They further argue that the evidence of secondary considerations presented by BFG only served to reinforce the conclusion of obviousness.

■ Obviousness under 35 U.S.C. § 103 is a legal conclusion involving four factual inquiries. *Uniroyal*, 837 F.2d at 1050, 5 USPQ2d at 1438. These inquiries consist of: "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness." *Id.* Secondary considerations include evidence of factors tending to show nonobviousness, such as commercial success of the invention, satisfying a long-felt need, failure of others to find a solution to the problem at hand, and copying of the invention by others. *Id.; Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566, 1 USPQ2d 1593, 1595 (Fed. Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

■ When obviousness is based on a particular prior art reference, there must be a showing of a suggestion or motivation to modify the teachings of that reference. *E.g., ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577, 221 USPQ 929, 933 (Fed.Cir.1984). This suggestion or motivation need not be expressly stated. *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d

1015, 1025, 226 USPQ 881, 886 (Fed.Cir. 1985).

■ The district court found that the invention was obvious over Dunlop. The level of ordinary skill in the art was not in dispute, nor was the scope of the prior art, which included the Dunlop paper, the steel brake art such as was described in U.S. Patent 3,480,115, and the Concorde manual. The difference between Dunlop and the claimed inventions is relatively minor. The district court found that the only real difference is that the claims are limited to an *initial* thick/thin assembly whereas Dunlop discloses the thick/thin arrangement only for replacement of half-worn disks during brake overhaul. The district court stated that "Figure 14 [the overhaul schedule] plainly contemplates the continuation of the series of overhauls beyond the last date covered in the chart." The district court held that the overhaul schedule in Dunlop itself provided the suggestion for an initial thick/thin carbon brake assembly and hence rendered the claimed invention obvious.

The district court also analyzed the secondary considerations presented by BFG. It did not find that they overcame the strong teachings of the prior art. The assertion of "long-felt need" was discounted because the BFG invention was similar to the teachings of Dunlop. The failure of others was not found to be significant because there was only a brief time period during which manufacturers sought a solution to the problem of increased carbon utilization in aircraft brakes. Only slight evidence of skepticism by others was presented. Copying by others was not found to be compelling because there was no extensive development by competitors, and a noninfringing substitute was easily designed. The advantages of the invention were not found to be necessarily unexpected given the state of the prior art. Finally, the district court found that the evidence of commercial success was ambiguous.

We conclude that the district court's factual findings regarding the four *Graham* inquiries were not clearly erroneous. *See* Fed. R.Civ.P. 52(a) (1995). As explained above, these findings were supported by the evidence of record, and we do not have a definite and firm conviction that a mistake was made as to those findings. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").

In addition, we agree with the district court's ultimate conclusion of obviousness. As the district court recognized, the overhaul schedule in Dunlop contemplates continuation of the combination 3 and 5 overhaul methods. Dunlop also teaches maximizing carbon utilization by filling the "envelope," the space available for disks in the brake, using any combination of new or part worn or reclaimed disks. In addition, ABS's and Allied–Signal's expert witness, as well as BFG's expert witness, testified that those skilled in the art would know to fill the brake "envelope" to obtain maximum use of the available space. BFG has indicated a connection between an initial thick/thin assembly and "filling the envelope." Moreover, as the inventor himself agreed, if a thick/thin arrangement makes sense for an overhaul, it would seem to be logical to adopt it *ab initio*. Accordingly, the teachings of Dunlop, to one skilled in the art, provide a suggestion of an initial thick/thin brake assembly. We also agree with the district court that the secondary considerations were not convincing of nonobviousness. Considering the minor difference between the claimed invention and the teachings of Dunlop, the secondary considerations were not sufficiently compelling. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 291–92, 227 USPQ 657, 663 (Fed.Cir.1985).

Because we hold that claims 2 and 3 of the '895 patent and claims 1–4 of the '017 patent are invalid as having been obvious over Dunlop, we need not reach the issues relating to the on-sale bar and infringement.

B. *Inequitable Conduct*

■ A determination of inequitable conduct is committed to the district court's discretion. Accordingly, we review the district

court's judgment under the abuse of discretion standard. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876, 9 USPQ2d 1384, 1392 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). To overturn such a discretionary ruling of a district court, "the appellant must establish that the ruling is based on clearly erroneous findings of fact or on a misapplication or misinterpretation of applicable law, or evidences a clear error of judgment on the part of the district court." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178, 33 USPQ2d 1823, 1827 (Fed.Cir.1995).

ABS and Allied–Signal allege inequitable conduct with respect to several pieces of prior art. In particular, they allege that BFG engaged in inequitable conduct in its failure to disclose to the PTO Dunlop, the Concorde manual, U.S. Patent 3,480,115 showing an example of the steel brake art, BFG's own steel brake prior art, and BFG's activities with Boeing and Airbus. They also allege that the statements in the Perry affidavit provide evidence of an intent to mislead.

BFG argues that there was no intent by the inventor, Bok, or his attorneys to mislead the PTO. BFG asserts that there is no evidence that Bok or his attorneys knew of Dunlop during prosecution. While they of course knew of the Boeing and Airbus activities, BFG argues that it had a reasonable belief that these activities did not violate the on-sale bar. BFG also argues that the Perry affidavit does not show an intent to mislead the PTO, because all the statements in the affidavit were true.

 Inequitable conduct consists of an "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins,* 48 F.3d at 1178, 33 USPQ2d at 1826. One alleging inequitable conduct must prove the threshold elements of materiality and intent by clear and convincing evidence. *Id.,* 33 USPQ2d at 1826–27. The district court must then weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether the equities

warrant a conclusion that inequitable conduct occurred. *Id.*

Much of the prior art involved here certainly was material. Dunlop was directly relevant to the problem addressed by the '017 and '895 patents; it discloses techniques for increased carbon utilization in aircraft brakes, as well as a thick/thin aircraft brake assembly. BFG's sales activities were also material, because they were potential statutory bars under 35 U.S.C. § 102(b). The steel brake art included brakes having steel disks of varying thickness, and the Concorde manual disclosed carbon brakes with disks of varying thickness. All of this prior art was thus arguably material.

 The focus of the inequitable conduct issue in this case must thus be on intent, which is a question of fact. *See Molins,* 48 F.3d at 1178, 33 USPQ2d at 1827. We must affirm the district court on this issue unless its finding was clearly erroneous. *Id.* The district court was troubled by BFG's conduct, but essentially gave it the benefit of the doubt because determinations of obviousness and the applicability of the on-sale bar are often close and subject to varying reasonable interpretations. In particular, the district court stated that "[t]he application of the on-sale bar in § 102(b) and the factors determining obviousness under § 103 is by no means a certain enterprise, and the fact that the Court has found the patents invalid on these grounds does not mean that BFG's failure to submit this art and information in connection with its patent applications was intentionally misleading."

We too are troubled by BFG's conduct, but conclude that the district court did not clearly err in its findings or abuse its discretion in determining that BFG did not engage in inequitable conduct. "[A] finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown,* 863 F.2d at 876, 9 USPQ2d at 1392.

There was a basis for the patent attorney prosecuting the applications to conclude that

BFG's meeting with Boeing did not trigger the on-sale bar on the ground that it was a technical, not a sales, meeting, and thus that it need not have been disclosed to the PTO. Prudence would have dictated otherwise, but the requisite evidence of intent to deceive is lacking. In addition, the Airbus activity seemingly occurred outside the United States, and its nondisclosure does not reveal an intent to deceive. Even though Dunlop was in the files of several BFG employees, it is not clear that Bok and his attorney possessed it. The evidence tends to show that Bok only became aware of Dunlop after the '017 and '895 patents issued, and the patent attorney was not on the circulation list to receive the publication. There is also a letter of record from BFG to a foreign attorney indicating after the patents issued that BFG had just recently become aware of Dunlop. The other alleged prior art is similarly not associated with evidence of an intent to deceive.

 The Perry affidavit is more troubling, but also falls short of providing an inference of an intent to mislead the PTO. While the statements in the affidavit are true, as BFG asserts, this alone does not negate a finding of inequitable conduct, since truthful statements can be crafted in a misleading manner through intentional omission of particular relevant facts. However, there is no evidence of intentional omission of relevant facts in the affidavit and, in particular, no evidence that Perry in fact knew of Dunlop. While Perry was not called as a witness at trial due to an agreement between the parties, relevant portions of his deposition transcript are of record. In Perry's deposition, he testified that he "may have seen it [Dunlop] before," but did not "specifically remember seeing it." He also testified that he did not recall seeing the copy of Dunlop on which his name was handwritten as part of a circulation list. The district court's conclusion that evidence of intent to deceive is lacking cannot be said to be clearly erroneous.

We have considered whether the totality of the actions here lead to an inference of an intent to deceive even though the individual instances do not. We arrive at the same conclusion, lack of evidence of intent. It is not surprising that those who are careless exhibit those qualities more than once. It still does not demonstrate, without more, an intent to deceive. Accordingly, we conclude that the district court did not clearly err in its finding of lack of intent to deceive or abuse its discretion in finding that BFG did not engage in inequitable conduct. In the absence of an intent to deceive, courts cannot find inequitable conduct merely because patents are held invalid over the relevant prior art. Having affirmed the district court's conclusion that there was no inequitable conduct, we also affirm its conclusion that this case was not exceptional and hence its denial of attorney fees.

Our conclusion does not mean, however, that we condone BFG's conduct in prosecuting the '017 and '895 patents. Barely dodging a bullet based on our deference to a trial court's decision on the factual question of intent and on a matter of equity does not merit approval or justify complacency. BFG's conduct shows a pattern of careless patent prosecution. It has led to the grant of a patent which is invalid over a withheld reference. While we have not reviewed the holding of invalidity based upon the on-sale bar, there certainly was a close question concerning that uncited event. The Perry affidavit evidences questionable conduct, considering that Perry's name was on a circulation list for Dunlop and that he stated in his affidavit that he was responsible for knowing the literature on aircraft brakes and that he had never seen a brake assembly as described and shown in the '017 and '895 patents. Submission of careless statements under oath deserves criticism, but, as noted above, we are not able to conclude that the district court erred in failing to find intent to deceive from these actions.

## CONCLUSION

Because the district court did not err in holding the '017 and '895 patents invalid on the ground of obviousness, we affirm the district court's judgment of invalidity. Because the district court did not err in holding

that BFG did not engage in inequitable conduct due to insufficient evidence of an intent to deceive the PTO in prosecuting the '017 and '895 patents, we affirm the district court's judgment regarding inequitable conduct, and we deny ABS's and Allied–Signal's request for attorney fees. In light of our holding that the '017 and '895 patents are invalid on the ground of obviousness, the issues relating to the on-sale bar and infringement are moot.

*AFFIRMED.*